[Civ. No. 53319. First Dist., Div. One. Apr. 26, 1982.]

SAN FRANCISCO UNIFIED SCHOOL DISTRICT, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA, Defendant and Respondent;
STATE DEPARTMENT OF EDUCATION et al., Real Parties in Interest and Appellants.

COUNSEL

George Deukmejian, Attorney General, John J. Klee, Jr., Deputy Attorney General, Sheila L. Brogna, Marcia Robinson Lowry, George Kannar and Marcia Rosen for Real Parties in Interest and Appellants.

Patrick S. McGovern and Corinne Lee for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

OPINION

NEWSOM, J.—Appellant Christopher T. (real party in interest, hereinafter Christopher) is a minor resident of the City and County of San Francisco, and attends school in respondent school district (hereinafter district).

In May 1980, an individualized education program was prepared for Christopher by the district to accommodate his emotional handicap; it supplemented Christopher's regular classroom studies with certain special educational services. Through his guardian and representatives, Christopher claimed the individualized education program was insufficient to serve his educational needs, and requested a hearing before real party in interest State Department of Education (hereinafter Department) pursuant to Education Code section 56505, asserting inter alia, that his disability required the district to provide him with 24-hour a day residential care.

A hearing before the Department was held on June 17, 1980, and September 8, 1980. On October 6, 1980, the hearing officer issued his proposed decision, ruling that the program provided by the district did not meet Christopher's educational needs, and that the child required a full-time residential-educational program, funded by the district.

The decision was subsequently approved and adopted by the office of the superintendent of public instruction.

On December 26, 1980, the district filed a petition for a writ of administrative mandamus (Code Civ. Proc., § 1094.5) in the Superior

Court of the City and County of San Francisco, seeking review of the hearing officer's decision and an order commanding the Department to set it aside.

Christopher demurred to the petition and moved to stay the proceedings on the ground that a class action between the parties presenting the same issues was pending in federal court; the motions were denied because the federal action involved parties and issues which were not before the state court.[1]

On April 21, 1981, the superior court issued an intended decision setting aside the administrative decision. Judgment granting the district's peremptory writ of mandate was entered on June 10, 1981. Notices of appeals were filed by Christopher and the Department on July 9 and 13, 1981, respectively.

On September 2, 1981, this court issued a modified writ of supersedeas ordering the district to "place and maintain [Christopher] in Wide Horizons School or in any other appropriate twenty-four hour residential program selected by the [district]," and to implement the administrative decision pending appeal. Through counsel, however, Christopher refused placement in a residential school other than Wide Horizons, as offered by the district, and because Wide Horizons was unavailable, he is not presently attending any district-funded residential school.

During his early youth, Christopher lived with his mother and a series of stepfathers. His early family history was chaotic, marked by conflicts between his mother and his maternal grandmother. In April of 1976, Christopher's grandmother obtained legal and physical custody of him. His mother continued to visit him pursuant to a court order, and the conflict between the parties persisted.

Christopher exhibited a history of academic and behaviorial problems between 1977 and 1980, including emotional difficulties, poor peer-relations, absenteeism and tardiness. In the fall of 1977, he was given a psychiatric evaluation and thereafter commenced a therapy program with a licensed clinical worker, Carolyn Fromm, which continued until

---

[1]The class action filed by Christopher and other similarly situated students of the district challenges the district's refusal to place educationally handicapped students in 24-hour residential programs.

October 1979. During 1979 and 1980, his school performance declined, until, at his grandmother's request, he sought a special education assessment in February 1980.

After testing conducted by respondent district, it was found that Christopher was functioning academically one or two years below his grade level, and had difficulty processing words visually and phonetically, even though he possessed higher than average intellectual potential. Following this testing, the district proposed an individualized education program (IEP) for Christopher, who was characterized as severely emotionally disturbed. The IEP placed Christopher in a learning-disabled group with special support services, with, however, at least 50 percent of his school day to be spent in a regular classroom.

Both Christopher's grandmother and Ms. Fromm felt that Christopher needed residential placement, which the district refused to recommend, and so Mrs. Howard, on Christopher's behalf, requested a state hearing to resolve the dispute. (Ed. Code, § 56501.)

At the hearing, Christopher offered the testimony of four witnesses, and his own.

Carolyn Fromm, a psychiatric social worker at Children's Hospital in San Francisco, and Christopher's therapist for nearly three years, testified that he had a "chronic diffuse anxiety" and emotional problems which interfered with his academic work. Although she had not seen Christopher since October 1979, Ms. Fromm recommended a "residential school" or a therapeutic "nonresidential school" as the only educational setting which would allow him to perform academically. (She also issued an extensive written report which was made part of the record.)

Testimony was also offered by Robin Orme, an attorney of wide experience representing Christopher, as he had many other juveniles, by Mrs. Howard and Richard Capurro, a case worker at legal services for children who had assisted in Christopher's representation. All essentially testified that, in order to resolve his emotional conflicts and realize his academic potential, Christopher needed to be separated from his existing family environment and placed in a neutral residential atmosphere. Also admitted were letters from family court services counselor Jeanne Ames, and Dr. Morton Nerril, director of child psychiatry at

Children's Hospital, both indorsing the idea of a residential school environment for Christopher.

The district offered the testimony of two witnesses: Jan Lauer, a social worker who had been instrumental in developing the IEP for Christopher, and Ms. White, Christopher's teacher. Ms. Lauer opined that the child had an "emotional disturbance" caused by his home environment which interfered with his full academic performance. It was her opinion that the IEP program devised by the district, combining a learning disability group class with regular classroom placement, best suited his needs. Her testimony was that residential placement would probably not be helpful to Christopher, and might be counterproductive. Ms. White was of similar mind.

At the close of the hearing, due to the conflict in testimony, the hearing officer ordered a continuance for the purpose of obtaining an independent assessment of Christopher's educational needs and difficulties. By agreement of the parties, the independent assessment was conducted by the child study unit at the University of California Hospital at San Francisco (CSU) during the summer of 1980. To implement the assessment, CSU requested and received (1) a summer program at the Wide Horizons residential school; and (2) testing reports submitted by Patricia Evans, a speech pathologist for the San Francisco Speech and Hearing Center.[2]

The CSU assessment and report found significant learning disabilities. A neurodevelopmental disorder was noted, which resulted in distractable behavior and significantly reduced academic performance under emotional stress. The report concluded that "underlying learning disabilities [associated with problems in perceptual-motor integration, fine motor control and language processes] interact with social-emotional issues [associated with his ability to maintain impulse and contain anxieties under conditions of stress]."

The CSU report recommended a school program which would focus upon neurodevelopmental irregularities and emotional-social factors to reduce the adverse impact of emotional problems upon academic progress. It did not specify that a residential program was unequivocally

---

[2]Ms. Evans also testified at the hearing. She concluded that Christopher had auditory problems, affected by his emotional handicap, which interfered with his academic performance.

necessary, but noted that such placement would offer "respites from conflicts at home and a chance for a fresh start in a stable, consistent setting where he might get comprehensive intensive help with both his learning and behavior problems."

After receipt of the independent assessment report, the hearing officer determined that the district's IEP had inadequately addressed Christopher's special needs.[3] In conclusion, the hearing officer explained: "The composite picture of Petitioner's special needs from the various evaluations that have been conducted indicate that Petitioner has neurological impairments resulting in underlying learning disabilities, including problems in perceptual-motor integration, fine motor control, and language processes, that are compounded by social-emotional difficulties associated with Petitioner's problems maintaining impulse control and anxiousness under conditions of stress. [¶] The evidence also indicates that Petitioner's home life is not providing him with the moral framework or emotional strength and stability for Petitioner to develop the psychological skills to compensate for his neurodevelopmental irregularities. Moreover, Petitioner's coping mechanisms are denial and avoidance, as a result of his emotionally charged home environment. In sum, Petitioner requires a cohesive, consistently structured environment that can provide the psychological services, role models, and academic services which Petitioner requires. In light of the complexity and interrelated nature of Petitioner's handicaps, and in light of the evidence that Petitioner's school performance worsens when conflict increases in his home situation, it is decided that Petitioner requires multidisciplinary interventions, including psychological services, social work services, and special education, which cannot be provided in a day school program."

I

The first issue presented on appeal is whether respondent district should have sought review of the hearing officer's decision pursuant to federal law (20 U.S.C. § 1415(e)(2)), rather than by way of the state administrative mandamus remedy as provided in Code of Civil Procedure section 1094.5. In its opening brief, the Department suggests that review of an administrative hearing officer's decision made pursuant to the Education of All Handicapped Children Act

---

[3]The hearing officer's decision also states that the IEP was inaccurate and incomplete in its statement of evaluation and objectives.

(hereinafter Act) is controlled by the exclusive procedural review mechanism provided in 20 United States Code section 1415. A writ of administrative mandamus pursuant to section 1094.5 of the California Code of Civil Procedure, the Department argues, is an inappropriate form of judicial review in such cases.

Under the Act (20 U.S.C. § 1401 et seq.), Congress has provided for financial assistance to states which have adopted and approved a plan granting a "free appropriate education" to all handicapped children. (20 U.S.C. §§ 1401, 1412.) But, as noted in *Armstrong* v. *Kline* (E.D.Penn. 1979) 476 F.Supp. 583: "Besides supplying them with federal monies to help support the education of handicapped children, the Act imposes certain duties on [state educational agencies] and the local and intermediate agencies which receive funds from them. One of the major responsibilities of these agencies is assuring all handicapped children provision of a 'free appropriate public education,' 20 U.S.C. § 1412(1)."[4] (*Id.*, at p. 602.)

Significantly, the Act also affords extensive procedural safeguards to parents and handicapped children on questions relating to the provision of a free appropriate public education, including written prior notice of any proposed change in the educational placement of a child (20 U.S.C. § 1415(b)(1)(C)); the right to present a complaint either seeking or contesting such a placement change (20 U.S.C. § 1415(b)(1)(E)); the right to an impartial due process hearing and an appeal of any initial hearing determination "to the State educational agency which shall conduct an impartial review of such hearing" (20 U.S.C. § 1415(c)); and the right of an "aggrieved party" to "bring a civil action with respect to the complaint presented pursuant to this section, ..." (20 U.S.C. § 1415(e) (2)-(e)(4).) (*Sherry* v. *New York State Ed. Dept.* (W.D.N.Y. 1979) 479 F.Supp. 1328, 1332-1333.)[5]

---

[4]California has approved such a plan, and receives federal funds. (Ed. Code, § 56000 et seq.)

[5]Section 1415(e) provides: "(e)(1) A decision made in a hearing conducted pursuant to paragraph (2) of subsection (b) of this section shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (c) and paragraph (2) of this subsection. A decision made under subsection (c) of this section shall be final, except that any party may bring an action under paragraph (2) of this subsection. [¶] (2) Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State

The "civil action" contemplated by section 1415(e) may be brought either in state or federal court. According to the statute, in addition to noticing the administrative record, the court must "hear additional evidence" at the request of either party. In a section 1415(e) proceeding, the court is directed to base its decision "on the preponderance of the evidence," and is permitted to "grant such relief as [it] determines is appropriate."

California complies with the Act by providing an "impartial due process hearing" at the state level (Ed. Code, §§ 56500-56507), conducted "by a person knowledgeable in the laws governing special education and administrative hearings under contract with the department." (Ed. Code, § 56505, subd. (c).) However, no right of judicial review of decisions rendered pursuant to the Act is specified. The state judicial review remedy is provided by the general administrative mandamus statute, section 1094.5.

Numerous distinctions between a mandamus proceeding under section 1094.5 and the "civil action described in section 1415(e)(2)" are evident. The right to present additional evidence in a section 1094.5 action is limited to such evidence as could not, in the exercise of reasonable diligence, have been produced before the administrative agency, and any evidence improperly excluded by the administrative agency (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242]; *Dare* v. *Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 799 [136 P.2d 304]). A section 1415(e)(2) "civil action" on the other hand authorizes, and indeed directs, the court to hear "additional evidence at the request of a party." The standard of review is also significantly different under section 1094.5, a review of administrative decisions not involving a fundamental, vested interest, is restricted by application of the substantial evidence test (*Harmon* v. *Board of Retirement* (1976) 62 Cal.App.3d 689, 692 [133 Cal.Rptr. 154]), while

court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. [¶] (3) During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed. [¶] (4) The district courts of the United States shall have jurisdiction of actions brought under this subsection without regard to the amount in controversy."

section 1415(e)(2) permits a court to exercise its independent judgment and employ a "preponderance of the evidence" test.[5a] Finally, while the nature of relief available in a mandamus action is limited, section 1415(e)(2) directs that the court "shall grant such relief as [it] determines is appropriate."

In light of the substantial distinctions between the review procedures provided by the conflicting state and federal statutes, the Department submits that a party seeking to review an administrative decision should be compelled to follow the more specific and unrestricted review procedure provided in section 1415(e)(2). Both Christopher and the respondent district, on the other hand, insist that either review procedure may be *elected* by the aggrieved party.

█ Several preliminary obstacles to consideration of this issue on appeal immediately surface. First, the only party "aggrieved" by the administrative determination—the district—selected the less expansive route provided by section 1094.5, and thus not only "invited" the error (*Redevelopment Agency* v. *City of Berkeley* (1978) 80 Cal.App.3d 158, 166 [143 Cal.Rptr. 633]), but also waived any right to appeal on the issue by accepting the benefits of the judgment. (*Lee* v. *Brown* (1976) 18 Cal.3d 110, 114 [132 Cal.Rptr. 649, 553 P.2d 1121].) In addition, since the district prevailed in the trial court, any error which accompanied the use of the section 1094.5 procedure was clearly harmless to it. (*Kristovich* v. *Crail* (1971) 18 Cal.App.3d 589, 592 [96 Cal.Rptr. 207].)

Only Christopher was prospectively harmed by the trial court's judgment, and he may not challenge the propriety of the section 1094.5 action for a number of reasons. First, he was not a party "aggrieved" by the administrative decision and therefore could not, under the express language of section 1415(e)(2), bring a "civil action." Also, he never objected to the district's use of the mandamus procedure at trial, and thereby waived any right to complain of it on appeal.[6] (*Morgan* v.

[5a]We recognize, of course, that the right of an educationally disabled child to a "free appropriate education" may be fundamental and vested, thereby invoking the independent review test under the state review mechanism. (See e.g., *Frink* v. *Prod* (1982) 31 Cal.3d 166, 178-180 [181 Cal.Rptr. 893, 643 P.2d 476].)

[6]Christopher and the Department demurred to the district's petition on the ground that a federal action under section 1415(e) was pending, but such argument was not directed to the propriety of the section 1094.5 proceeding.

*Stubblefield* (1972) 6 Cal.3d 606, 623 [100 Cal.Rptr. 1, 493 P.2d 465]; *Dugar* v. *Happy Tiger Records, Inc.* (1974) 41 Cal.App.3d 811, 817 [116 Cal.Rptr. 412].) In addition, it is in Christopher's favor to accept the 1094.5 action, since that form of action deprived the district of the right to present additional evidence or obtain an independent judicial review in its attempt to reverse the administrative decision. He suffered no demonstrable prejudice from the more restricted section 1094.5 hearing afforded the parties.

While the Department questioned the mandamus action in the trial court, it was neither an "aggrieved party" under section 1415(e)(2), nor, like Christopher, did it suffer prejudice from the use of that method of review. Moreover, its complaint is inconsistent with its claim that it is not a proper party to this action.

■ Under the present circumstances, therefore, we find it unnecessary to decide which method of appeal is proper, even though from what we have said it will be clear that in our view 20 United States Code section 1415(e)(2) should be employed by parties seeking to review an administrative hearing officer's decision rendered pursuant to the Act—particularly where state review procedures, as in California, provide lesser protection or a more limited scope of review to the party aggrieved.[7]

Section 1415(a) dictates such a result; it requires the states to "establish and maintain procedures in accordance with subsection (b) through subsection (e) of this section to assure that handicapped children and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education ... [state or local educational] agencies and units." Accordingly, whenever a conflict exists between the procedural safeguards mandated by 20 United States Code section 1415 and state law, applicable federal law is controlling. (*Vogel* v. *School Bd. of Montrose R-14 School Dist.* (W.D.Miss. 1980) 491 F.Supp. 989, 991-993; *Matter of "A" Family* (1979) 184 Mont. 145 [602 P.2d 157, 166].) As explained in *Monahan* v. *State of Neb.* (D.Neb. 1980) 491 F.Supp. 1074,[8] at page 1091: "The

---

[7]We deem this question—academic on the present record—to be sufficiently important and recurring as to warrant full discussion, as required by the Department.

[8]Modified at 645 F.2d 592, but not with regard to the issue here considered.

Education of All Handicapped Children Act provides specific procedural safeguards which must be adopted by the states receiving funds under the Act. These safeguards govern educational proceedings in [this state], since it is the recipient of funds under the Act. Thus, any [state] law which is inconsistent with these federally mandated procedures is superseded by the federal law."

Another factor favoring use of federal procedure is that the writ of mandate will not lie where the petitioner has a plain, speedy and adequate remedy at law. (Code Civ. Proc., § 1086; *Tivens v. Assessment Appeals Bd.* (1973) 31 Cal.App.3d 945, 947 [107 Cal.Rptr. 679]; *Grant v. Board of Medical Examiners* (1965) 232 Cal.App.2d 820, 826 [43 Cal.Rptr. 270].) Here, the "civil action" available under section 1415(e)(2) provides an "aggrieved party" with an alternative and more complete remedy at law, thus precluding resort to mandamus. (*Royal Convalescent Hospital, Inc. v. State Board of Control* (1979) 99 Cal. App.3d 788, 793 [160 Cal.Rptr. 458]; *Mystery Mesa Mission Christian Church, Inc. v. Assessment Appeals Bd.* (1976) 63 Cal.App.3d 37, 39-40 [133 Cal.Rptr. 565]; *Rhode Island Ins. Co. v. Downey* (1949) 95 Cal.App.2d 220, 247 [212 P.2d 965].)

Such an approach, we believe, will also reduce confusion and the chance of prejudice. For example, if the "aggrieved party"—here, the district—were permitted to elect the limited state review by mandamus, the child could not avail itself of the more liberal federal procedure because it would not be an "aggrieved party" under section 1415(e)(2).

The "election" approach would also cause confusion if both sides sought review following a decision which gave neither all that was requested. In such a case, both parties would be arguably "aggrieved" and *could* thus demand conflicting methods of review.[9]

Another anomaly is avoided by requiring federal appellate review. If, as here, the child prevails at trial, and the school district brings a mandamus action which is denied on the merits, the section 1415(e)(2)

[9]Of course, the federal procedure would take precedence in such a case, but hearings would be required to resolve the issue.

"civil action" being a different cause of action, the judgment in the mandamus action would not be binding under res judicata principles and the district would be free to seek a second review.

For all of these reasons we opine that the section 1094.5 procedure should be unavailable to review administrative decisions under the Act, absent waiver or on other special circumstances, as found here.

## II

■ It is next argued by the Department, that it is not a proper and necessary party to this action for purposes of judgment and an award of damages, costs or attorney's fees. The Department has no objection to being considered a nominal party but denies it is a real party in interest since it acts only to oversee the provisions of the Act and provide a forum for resolution of disputes between a handicapped child and the local school district.

The question is a close one, and we find some merit in the Department's argument. Nevertheless, it is true that the Department is the agency responsible for assuring that the requirements of the Act are implemented, and it must exercise "general supervision" over programs to insure that handicapped children receive a "free appropriate education." (20 U.S.C. § 1412.) For these limited purposes, therefore, we find it necessary to retain the Department as a party to this appeal to ensure performance of its obligation to implement any court-ordered educational placement. (*Tatro* v. *State of Tex.* (N.D.Tex. 1981) 516 F.Supp. 968, 972; *Ass'n. for Retarded Citizen in Colo.* v. *Frazier* (D.Colo. 1981) 517 F.Supp. 105, 113.)

## III

■ The parties have conceded that the trial court properly employed the substantial evidence test to review the hearing officer's decision in the mandamus proceeding. On appeal, our reviewing power is likewise limited to a consideration of whether the agency's findings are supported by substantial evidence and whether the agency committed any errors of law. (*McConville* v. *Alexis* (1979) 97 Cal.App.3d 593, 600 [159 Cal.Rptr. 49]; *Dawn* v. *State Personnel Board* (1979) 91 Cal. App.3d 588, 601 [154 Cal.Rptr. 186].) ""It is not our function to

reweigh the evidence.""" (*Overton* v. *State Personnel Bd.* (1975) 46 Cal.App.3d 721, 725 [120 Cal.Rptr. 226].)

The propriety of the hearing officer's determination must be determined in accordance with these standards.

Using such standards of review, we next consider appellant's contention that the trial court erred in ruling that the evidence does not support the hearing officer's determination that a 24-hour residential educational program was necessary to meet Christopher's educational needs under the Act.

We have found the cornerstone of the Act to be the requirement that states which accept federal funds assure all handicapped children of a "free appropriate education." (20 U.S.C. § 1412(1); *Campbell* v. *Talladega Cty. Bd. of Ed.* (N.D.Ala. 1981) 518 F.Supp. 47, 52; *Armstrong* v. *Kline, supra,* 476 F.Supp. 583, 602.) Neither the statutes nor accompanying regulations specifically define the term "free appropriate education"[10] (*Springdale School Dist. # 50* v. *Grace* (8th Cir. 1981) 656 F.2d 300, 304; *Campbell* v. *Talladega Cty. Bd. of Ed., supra,* 518 F.Supp. 47, at p. 52), and the case law has not settled upon a definite standard. A vast majority of the decisions have adopted the general standard expressed in *Rowley* v. *Bd. of Ed. of Hendrick Hudson Cent.S.D.* (S.D.N.Y. 1980) 483 F.Supp. 528, 534, "... that each handicapped child be given an opportunity to achieve his full potential commensurate with the opportunity provided to other children...." (See also *Springdale School Dist. # 50* v. *Grace, supra,* 656 F.2d 300, 304; *Hines* v. *Pitt County Bd. of Ed.* (E.D.N.C. 1980) 497 F.Supp. 403, 406.) It is undisputed that an "appropriate education" requires something more than merely those services which would enable the stu-

---

[10]"Free appropriate public education" is defined in the Act as "special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title." (20 U.S.C. § 1401(18).)

The Act's definition of "special education" provides some further guidance as to the meaning of "free appropriate education," it states: "The term 'special education' means specially designed instruction, at no cost to parents or guardians, *to meet the unique needs* of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." (20 U.S.C. § 1401(16), italics added.)

dent to graduate from grade to grade. (*Rowley, supra,* at p. 534; *Campbell, supra,* 518 F.Supp. 47, 53-54.)[11]

Concerning residential placement, it is settled that the Act contemplates such educational services if warranted. (*North v. District of Columbia Bd. of Ed.* (D.D.C. 1979) 471 F.Supp. 136, 139.) According to 20 United States Code section 1401(16), "the term 'special education' means specifically designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including . . . *instructions in hospitals and institutions.*" (Italics added.)

The regulations promulgated under the Act also explicitly provide for residential placement (*Kruelle v. New Castle County Sch. Dist.* (3d Cir. 1981) 642 F.2d 687, 692). 45 Code of Federal Regulations section 84.33(c)(3) states: "If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child. [¶] Comment. This requirement applies to placements which are made by public agencies for educational purposes, and includes placements in State-operated schools for the handicapped, such as a State school for the deaf or blind." Under 45 Code of Federal Regulations section 121a.552(a)(2) and (a)(3), residential placement is to be as close as possible to the child's home. (*Hines v. Pitt County Bd. of Ed., supra,* 497 F.Supp. 403, 406.)

California law is consistent. The California Administrative Code, title 5, section 3209, subdivision (a) provides: "Individuals may be placed in nonpublic residential programs when no appropriate day program is available to meet the specific educational needs of the individual within a reasonable distance from the home of the individual in either a public or nonpublic school; or the individual requires education and related intervention by a multi-disciplinary team which cannot normally be provided in a day program."

We acknowledge that the Act requires consideration be given to the "mainstreaming policy" embodied in 20 United States Code section 1412(5)(B), which states: "[t]o the maximum extent appropriate, handicapped children, including children in public or private institutions or

---

[11]The diverse standards for "free appropriate education" used by courts reviewing claims brought under the Act include a "maximization of learning potential" (*Kruelle v. Biggs* (D.Del. 1980) 489 F.Supp. 169) "sufficient to make a handicapped person independent and self-sufficient" (*Armstrong v. Kline, supra,* 476 F.Supp. 583).

other care facilities, are [to be] educated with children who are not handicapped, ... " The mainstreaming policy is part of the more basic goal of the Act to educate handicapped children in the "least restrictive environment" possible. (See also 34 C.F.R. §§ 300.550-300.556; *Kruelle v. New Castle County Sch. Dist., supra,* 642 F.2d 687, 695.)

In light of these guiding principles, we weigh respondent's claims that Christopher's handicap is not sufficiently severe in either nature or degree to require residential placement under the aforementioned standards.

First, respondent submits that since Christopher's emotional problems are not related to educational disabilities, but rather to his home environment, the child suffers from no such disability as would require an individualized educational program. In so arguing, respondent relies upon 35 Code of Federal Regulations section 300.5(b)(9) which states, in pertinent part, that the term "specific learning disability ... does not include children who are having learning problems which are primarily the result of ... environmental, cultural, or economic disadvantage."

Neither case law nor the evidence presented at the administrative hearing supports this position.

Recently in *Kruelle v. New Castle County Sch. Dist., supra,* 642 F.2d 687, the identical issue was presented. Residential placement was sought for an emotionally troubled child. The school district argued that "here the residential placement is required only for reasons of medical and domiciliary care, not for educational purposes." (*Id.,* at p. 693.) Reflecting this argument, the court held that: "Analysis must focus ... on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process." (*Ibid.*)[12]

Here, as in *Kruelle,* substantial evidence in the form of expert testimony including the informed independent assessment of CSU supports the hearing officer's finding that Christopher's emotional problems ad-

---

[12]The exclusion in 35 Code of Federal Regulations section 300.5(b)(9) of children whose learning problems are the result of "environmental disadvantage" clearly is not intended to apply to emotionally disabled children such as Christopher.

versely affect his ability to learn and thus interfere with his educational progress.

We accordingly find that substantial evidence supports the conclusion that Christopher's emotional problems are so linked with his learning disability as to justify and require that he be provided with an individualized education program. (*North* v. *District of Columbia Bd. of Ed., supra*, 471 F.Supp. 136, 141.)

There remains the issue of whether, considering the nature and degree of his disability, residential placement is the appropriate and necessary program for Christopher.

As the record shows, the hearing officer concluded that the IEP devised by the district did not permit Christopher to "achieve appropriate educational progress." A factor which the hearing officer found particularly persuasive was the need for Christopher to escape his "emotionally charged home environment" in order for him to satisfactorily progress.

While conflicting evidence on this issue was presented at the hearing, substantial evidence, which we may not reweigh, supports the hearing officer's conclusion. Christopher was apparently not learning to his full potential commensurate with the opportunity provided to nonhandicapped children under the district's IEP, and his home life was apparently a major factor in his learning disability. And while the Act expresses a preference for "mainstreaming," the particular facts of the present case seem rather to establish the need for residential placement. (*Kruelle* v. *New Castle County Sch. Dist., supra*, 642 F.2d 687, 695-696; *Cox* v. *Brown* (D.D.C. 1980) 498 F.Supp. 823, 827; *North* v. *District of Columbia Bd. of Ed., supra*, 471 F.Supp. 136, 141; *Matter of "A" Family, supra*, 602 P.2d 157, 163.) We thus conclude that the trial court erred in finding no substantial evidentiary support for the hearing officer's decision.

■ Finally, appellant has requested recovery of attorney's fees on the private attorney general theory (Code Civ. Proc., § 1021.5), as well as restitution pursuant to Code of Civil Procedure section 908.

As to the application for fees, finding that the present action has not "'resulted in the enforcement of an important right affecting the public interest'" (*Amie* v. *Superior Court* (1979) 99 Cal.App.3d 421, 427 [160

Cal.Rptr. 271]), we deny the request. We conclude, however, that restitution of tuition costs for Christopher's placement is appropriate in the interests of justice. (Code Civ. Proc., § 908.) Such amount should be limited to tuition paid prior to September 2, 1981—the date the writ of supersedeas was issued by this court.

The judgment is reversed and the cause remanded to the trial court for a determination of the amount of such restitution.

Elkington, Acting P. J., and Levins, J.,* concurred.

A petition for a rehearing was denied May 26, 1982, and the petition of plaintiff and respondent for a hearing by the Supreme Court was denied July 7, 1982.

---

*Assigned by the Chairperson of the Judicial Council.